The PEOPLE of the State of Colorado,
Plaintiff–Appellee,

v.

Stephen MARTINEZ, Defendant–
Appellant.

No. 00CA0312.

Colorado Court of Appeals,
Div. I.

Dec. 20, 2001.

As Modified on Denial of Rehearing
Feb. 7, 2002.

Certiorari Granted Aug. 5, 2002.

Ken Salazar, Attorney General, Lauren Edelstein Park, Assistant Attorney General, Denver, CO, for Plaintiff–Appellee.

David S. Kaplan, Colorado State Public Defender, Ann M. Aber, Deputy State Public Defender, James Grimaldi, Deputy State Public Defender, Denver, CO, for Defendant–Appellant.

Opinion by Judge ROY.

Defendant, Stephen Martinez, appeals the trial court's judgment of conviction entered on a jury verdict finding him guilty of first degree, knowing murder of a child by a person in a position of trust, under § 18–6–401(7)(c), C.R.S.2001. We reverse and remand for a new trial.

On October 17, 1998, defendant was baby-sitting his girlfriend's four-month-old baby daughter born of a previous relationship. Defendant reported to the emergency operator that the child had begun choking after he fed her and that the child was pale and cold. Paramedics arrived and took the child to the hospital, where she died later that day.

Police officers arrived and noticed that the baby's crib sheet was missing. Defendant told the officers that he had placed the sheet in the washing machine because it was stained with the baby's blood. Both defendant and his girlfriend gave statements to the officers. In his statement, defendant reiterated what he had said to the emergency operator.

In a later videotaped interview with an investigating officer, defendant stated that the baby's death may have been due to an incident that had occurred two and one-half weeks earlier, in which he had tripped while feeding the baby and caused her to incur a minor head wound. The police detective questioned defendant's story, stated that the doctors said the baby's injury occurred that day, and encouraged defendant to confess. Defendant then stated that, on the day in question, he had grown frustrated with the baby's crying and shook her, and while he was shaking her, her head accidentally hit the crib. Defendant stated, "I shook her

hard," and also provided a demonstration of his actions that day.

The coroner testified that the baby suffered an occipital skull fracture, localized subdural and subarachnoid hemorrhages, optical nerve and retinal hemorrhages, a reported "history of acceleration/deceleration," and scalp bruises. The cause of death was complications from a blunt trauma to her head. All of the injuries were more or equally consistent with blunt trauma, except the optical nerve and retinal hemorrhages, which were more consistent with acceleration/deceleration.

The primary issue at trial was defendant's mental state when the incident occurred. Defendant's theory was that he shook the baby with minimal force, as demonstrated in the videotape, and that he accidentally hit her head on the crib. The jury was instructed on first degree murder, knowing murder of a child by a person in a position of trust, child abuse resulting in death (reckless), child abuse resulting in death (criminal negligence), manslaughter, and criminally negligent homicide.

## I.

Defendant contends that those portions of a pediatrician's testimony concerning fact patterns or events known to have produced subdural hematomas and the prosecutor's allusion to that testimony in closing argument as establishing the minimum force necessary to cause a subdural hematoma rise to the level of reversible error. We agree.

The prosecution sought to prove that defendant acted "knowingly" rather than "recklessly" or "with criminal negligence" by presenting expert testimony that the injuries sustained by the child resulted from a force so great that the defendant had to know his actions were practically certain to cause death, the standard for acting "knowingly."

A person acts "with criminal negligence" when he or she acts in a manner that is a gross deviation from the standard of care of a reasonable person or fails to perceive a substantial and unjustified risk; and he or she acts "recklessly" when he or she acts with a conscious disregard of a substantial and unjustifiable risk. Section 18–1–501(6), (8), C.R.S. 2001.

Specifically, the prosecutor, over defendant's objection, attempted to elicit testimony from physicians that a subdural hematoma occurs when a child is involved in a high-speed automobile accident or falls from a multistory building.

The prosecutor first sought this opinion from the deputy coroner who had performed the autopsy on the baby. The defense objected primarily on the basis of CRE 403, arguing that the testimony was misleading and irrelevant. The prosecutor stated that the evidence was offered to provide the jury with a frame of reference regarding the severity with which the baby had been shaken and the severity of impact of her head with the crib. The court sustained defendant's objection based solely on the form of the prosecutor's question.

Later, the prosecutor sought to elicit the same opinion from a pediatrician who specialized in child abuse. The defense again objected, stating that the court had already ruled that this testimony was inadmissible. The court clarified that it had merely upheld the defense's earlier objection based on the form of the question, and allowed the following testimony:

[Pediatrician]: ... A subdural hematoma is something that we only see in a few situations. For example, we see a subdural hematoma ... when—there are several examples of witnessed accidents, for example, in the medical literature....

. . . .

Prosecutor: Doctor, you were talking about the sort of mechanisms that can cause this. You have said violent and you have said massive. Let's talk about the kind of force we're talking about. Are there studies and are there known fact patterns that have caused this sort of injury? ...

[Pediatrician]: Yes.

Prosecutor: What sort of known fact patterns in the studies have you talked about?

[Pediatrician]: In talking about how much force that it requires to cause this kind of

injury, we can't take babies and shake them and do that for the obvious reason, so what we have had to do is take—there have been multiple studies of series of witnessed falls or witnessed accidents where babies have had similar kinds of injuries. Okay? And in those studies, babies who had similar kind of injuries, the subdural hematoma, have been things like a fall from a multiple story building. Being in a high speed motor vehicle accident either as a pedestrian hit by a high speed motor vehicle or, for example, an unrestrained passenger in a high speed motor vehicle accident, so those are the kinds of witnessed injuries that can lead to a similar sort of injury.

. . . .

Prosecutor: What did [the baby] suffer, epidural or subdural?

[Pediatrician]: [The baby] had a subdural hematoma.

Both physicians testified it would take considerable force to cause the injuries sustained by the baby. The coroner was permitted to demonstrate, using a doll, the level of violence necessary to cause the injury. And both physicians testified that the necessary force was considerably in excess of that testified to by defendant and demonstrated by him on the videotaped statement.

The prosecutor, in closing argument, referred to the pediatrician's testimony, stating:

Now that we know the extent of the injuries, right, the weight of the injuries, the extent of the mortal blows, and the mortal shaking, now we know the necessary force. As [the pediatrician] told us, we know it because it's fact; it's true. It has been observed in the real world. One, we now know the necessary force that takes us to that level of violence. The violence that must be exerted to exert that kind of force on the back of the child's head. Okay? And now we know his level of violence; we know his true actions. What did he have to have done? What did he have to do? And if he was doing that, he had to have known what he was doing, and he had to

have known what it was going to do to her. It is inescapable to conclude otherwise.

Relevant evidence is that which has any tendency to make the existence of a fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence. CRE 401. However, relevant evidence is excludable if its probative value is substantially outweighed by the danger of unfair prejudice, if it would confuse or mislead the jury, or if its consideration would cause undue delay, amount to a waste of time, or be cumulative. CRE 403.

An expert witness is permitted to express his or her opinion on scientific, technical, or other specialized knowledge if that opinion will assist the trier of fact to understand the evidence or determine a fact in issue. CRE 702.

In *People v. Shreck,* 22 P.3d 68 (Colo.2001), the supreme court held that CRE 702 and CRE 403 govern the admission of scientific evidence. With respect to the CRE 702 analysis, the court stated:

The focus of a Rule 702 inquiry is whether the scientific evidence proffered is both reliable *and relevant.* In determining whether the evidence is reliable, a trial court should consider (1) whether the scientific principles as to which the witness is testifying are reasonably reliable, and (2) whether the witness is qualified to opine on such matters. *In determining whether the evidence is relevant, a trial court should consider whether the testimony would be useful to the jury.*

*People v. Shreck, supra,* 22 P.3d at 77 (citations omitted; emphasis added).

The principal issue in *Shreck* was the reliability of the scientific evidence, in that case DNA evidence. In contrast, our inquiry here focuses primarily on the issue of relevancy. With respect to relevancy, the court in *Shreck* stated:

In addition, a trial court making a CRE 702 determination must apply its discretionary authority under CRE 403 to ensure that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice, confusion of

the issues, undue delay, waste of time, or needless presentation of cumulative evidence. Finally, a trial court's CRE 702 determination must be based upon specific findings on the record as to the helpfulness and reliability of the evidence proffered. The trial court must also issue specific findings as to its consideration under CRE 403 as to whether the probative value of the evidence is substantially outweighed by its prejudicial effect.

*People v. Shreck, supra,* 22 P.3d at 78 (citations omitted).

■■■■ Absent an abuse of discretion, a trial court's evidentiary rulings will be affirmed. To show an abuse of discretion, an appellant must establish that the trial court's decision to admit the evidence was manifestly arbitrary, unreasonable, or unfair. *See People v. Cardenas,* 25 P.3d 1258 (Colo.App. 2000).

Here, although the trial court did not explicitly find that the probative value of the pediatrician's testimony about observed accident scenarios that are known to have caused subdural hematomas in children was not substantially outweighed by danger of unfair prejudice, or that it would not confuse or mislead the jury, such findings are implicit in the court's decision to admit this testimony. *See People v. Copeland,* 976 P.2d 334 (Colo. App.1998), *aff'd,* 2 P.3d 1283 (Colo.2000).

■■■ The announced purpose of the testimony concerning observed accident scenarios that are known to have caused subdural hematomas in children was to establish that the force necessary to cause a subdural hematoma was such that defendant must have acted "knowingly" rather than "negligently" or "recklessly." For that purpose, the evidence was irrelevant, highly prejudicial, and, in addition, was likely to confuse or mislead the jury.

As presented and argued, the evidence was not probative of the force necessary to cause a subdural hematoma. Put another way, to determine how much force defendant must have inflicted on the baby, it is the minimum force, however characterized, necessary to inflict a subdural hematoma in a child that is relevant. The testimony of the pediatrician

of observed accident scenarios that are known to have caused subdural hematomas in children did not shed any light on that issue.

The lack of relevance, considering the purpose for which the evidence was offered, is demonstrated by the following syllogism, which is implicit in the pediatrician's testimony and the prosecutor's argument:

(1) Some children who suffer subdural hematomas are children who have been subjected to trauma or force such as that sustained by a fall from a multistory building or being unrestrained in a high-speed automobile accident.

(2) This child sustained a subdural hematoma.

(3) Therefore, this child was subjected to trauma or force equal to or exceeding that caused by a fall from a multistory building or being unrestrained in a high-speed automobile accident.

The syllogism, which is in the form of a "categorical syllogism," suffers from the classic fallacy of the "undistributed middle." An essential rule in deductive reasoning is that what is known as the "middle term" in a categorical syllogism must be distributed, that is, referred to in its entirety, in at least one premise. *See* D. Lind, *Logic and Legal Reasoning* 130 (2001). The rationale underlying this rule is described as follows:

Professor Copi [I. Copi, *Introduction to Logic* (7th ed. 1986)] has reminded us that the conclusion of any syllogism asserts a connection between two terms. This connection is justified only if those terms—the major and minor terms—can be connected with each other through or by means of the middle term. For the two terms that become part of the conclusion to be connected through a third, at least one of the two must be related to the *whole* of the class designated by the third or middle term. Otherwise each may be connected with a different part of the class and not necessarily connected with each other at all.

It is critical, therefore, that the middle term encompass a larger universe than the minor term. Compared then to the minor

term, which reflects only part of the class, the middle term is considered "distributed." If the middle term does not represent the larger portion of the class being considered, and represents or is equivalent to the portion represented by the minor term, we say that the middle term is "undistributed." When this occurs the connection to the conclusion cannot be justified; when this occurs we have the fallacy of the undistributed middle.

To put it in a formula, the fallacy occurs whenever it is argued that because $x$ and $y$ belong to the same class or possess a common property, they are identical. Some examples of the fallacy my help. Because business executives read the *Wall Street Journal,* a man who reads the *Journal* is a business executive. The ACLU supports the Democratic ticket; therefore, all those supporting the ticket adhere to ACLU causes.

R. Aldisert, *Logic for Lawyers: A Guide to Clear Legal Thinking* 148 (1989). If neither premise refers to the whole of the class represented by the middle term, the argument commits the fallacy of the undistributed middle.

It is one thing clearly to state that a certain quantum of force is necessary to produce a subdural hematoma; it is quite another to use examples of obviously extreme forces and violence that have been demonstrated to have caused subdural hematomas and then suggest that they constitute the minimum force necessary to cause such an injury in any particular case. In our view, reasonable inferences as to the underlying issue cannot be drawn from that testimony.

■ Given that the pediatrician's testimony and the prosecutor's allusion to it in closing went to the heart of the primary issue in the case, the admission of the evidence was not harmless. *Cf. People v. Mandez,* 997 P.2d 1254 (Colo.App.1999)(statements that did not go to theory of case deemed minimally prejudicial). Thus, we conclude that the testimony concerning accident scenarios causing subdural hematomas in children and the prosecutor's later allusion to it were unfairly prejudicial, and we reverse the conviction and remand the case for a new trial.

Having reached this conclusion, we need not address defendant's related argument concerning the prosecution's inconsistent positions.

## II.

Because it may arise on retrial, we address defendant's contention that § 18–6–401, C.R.S.2001, is unconstitutional. Defendant argues that § 18–6–401(7)(c), C.R.S.2001, provides a harsher punishment than § 18–6–401(7)(a)(I), C.R.S.2001, based on the nominal distinction of "position of trust" and that § 18–6–401 impermissibly imposes a harsher punishment for the murder of a child under the age of twelve than for the murder of a child between the ages of twelve and eighteen. We disagree with both arguments.

■ Equal protection of the laws, which assures like treatment to all who are similarly situated, is guaranteed by the Fourteenth Amendment and by article II, § 25 of the Colorado Constitution. A defendant is denied equal protection of the laws when two criminal statutes prescribe different penalties for identical conduct and the defendant is convicted and sentenced under the harsher statute. Consequently, statutory classifications of crimes must be based on differences that are real in fact and reasonably related to the purposes of the legislative enactments. At the same time, however, the General Assembly may establish more severe penalties for acts that it considers to have graver consequences, even if the differences are only a matter of degree. *People v. Rickstrew,* 775 P.2d 570 (Colo.1989).

■ In reviewing constitutional challenges to statutory provisions, we are guided by the principles that legislation adopted by the General Assembly is to be presumed constitutional and that a party asserting the unconstitutionality of any statute has the burden of proving such assertion beyond a reasonable doubt. *People v. Pate,* 878 P.2d 685 (Colo.1994). In ascertaining legislative intent, we first look to the plain language of the statute, and if the statute is ambiguous, we may look to legislative history for guidance. *State v. Nieto,* 993 P.2d 493 (Colo.

2000). Moreover, if a statute is susceptible to different interpretations, one of which comports with constitutional requirements, we must adopt that interpretation. *People v. Jefferson*, 748 P.2d 1223 (Colo.1988).

### A.

Defendant first argues that the term "position of trust" is a nominal distinction that is neither real in fact nor rationally related to a legitimate purpose. We disagree.

Section 18–6–401 provides in pertinent part:

(1)(a) A person commits child abuse if such person causes an injury to a child's life or health, or permits a child to be unreasonably placed in a situation that poses a threat of injury to the child's life or health, or engages in a continued pattern of conduct that results in malnourishment, lack of proper medical care, cruel punishment, mistreatment, or an accumulation of injuries that ultimately results in the death of a child or serious bodily injury to a child.

. . . .

(7)(a) Where death or injury results, the following shall apply:

(I) When a person acts knowingly or recklessly and the child abuse results in death to the child, it is a class 2 felony except as provided in paragraph (c) of this subsection (7).

. . . .

(c) When a person knowingly causes the death of a child who has not yet attained twelve years of age and the person committing the offense is one in a position of trust with respect to the child, such person commits the crime of murder in the first degree as described in section 18–3–102(1)(f).

The term "position of trust" was first utilized in the sexual assault statute, § 18–3–405.3, C.R.S.2001, but now has broader implications and is defined in § 18–3–401(3.5), C.R.S.2001:

One in a "position of trust" includes, but is not limited to, any person who is a parent or acting in the place of a parent and charged with any of a parent's rights, duties, or responsibilities concerning a child, including a guardian or someone otherwise responsible for the general supervision of a child's welfare, or a person who is charged with any duty or responsibility for the health, education, welfare, or supervision of a child, including foster care, child care, family care, or institutional care, either independently or through another, no matter how brief, at the time of an unlawful act.

While we agree with defendant that the term "position of trust" is broad and may apply to many if not most situations in which a person may be alone, or is entrusted, with a child, this breadth does not render the distinction nominal.

The legislative history of § 18–6–401(7)(c) reveals that the General Assembly considered that a child is more vulnerable to abuse if an offender is known to the child or is entrusted with the care of the child by one who is otherwise responsible for that care. *See generally* Hearings on H.B. 1109 before Subcommittee of the House Judiciary Committee, 60th General Assembly, First Session (Jan. 26, 1995); Hearings on H.B. 1109 before Senate Judiciary Committee, 60th General Assembly, First Session (Mar. 6, 1995).

In addition, given that a person in a position of trust is more likely to be alone with a child, to lure successfully a child to a place of isolation, or to be capable of manipulating a child, either in causing a child's submission to the abuse itself or in preventing a child from confiding in another about such abuse, the "position of trust" distinction is reasonably related to the more severe penalty associated with § 18–6–401(7)(c).

Thus, we conclude that the distinction of a position of trust is not nominal and sufficiently justifies the harsher penalty imposed under § 18–6–401(7)(c).

### B.

Defendant alternatively argues that the distinction between the death of a child under the age of twelve caused by child abuse,

which is a class one felony, and the death of a child between the age of twelve and eighteen caused by child abuse, which is a class two felony, is unconstitutional. Specifically, defendant argues that the General Assembly's "veneration and sentimental esteem" for younger children cannot form the basis for different punishments. In addition, defendant argues that the punishments prescribed are irrational, if not mismatched, given that it takes even greater force or dereliction to overcome an older child. We disagree.

At the outset, we note that § 18–6–401(2) defines a "child" as anyone under sixteen, not eighteen, years of age.

 The statutory scheme does not express the rationale behind this age distinction; therefore, we again turn to the legislative history. Our review of the legislative history reveals that the General Assembly was not motivated by either veneration or sentimental esteem. Instead, the legislative history indicates a belief that children under the age of twelve are more vulnerable than older children and thus deserve the greater protection an increased penalty is perceived to give. In addition, there was testimony that although the age of twelve may not always include the more vulnerable or exclude the less vulnerable, it is an appropriate age to make such a distinction. *See generally* Hearings on H.B. 1109 before Subcommittee of the House Judiciary Committee, *supra;* Hearings on H.B. 1109 before Senate Judiciary Committee, *supra.*

We thus conclude that this age distinction is based on differences that are real in fact and are also reasonably related to the more severe penalty associated with § 18–6–401(7)(c). *Cf.* § 6–1–112, et seq., C.R.S.2001 (Colorado Consumer Protection Act provides increased fine if victim elderly); §§ 18–1–105, 18–1–106, C.R.S.2001 (fines for felonies and misdemeanors committed upon victims who are sixty years of age and older).

The judgment is reversed, and the case is remanded for a new trial.

METZGER and DAVIDSON, JJ., concur.